THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY VESPUCCI, JAMES J. CORRIGAN, JR., CHARLES CANNIZZARO, MCM, Doing Business as ISLAND CARTING Co., ENVIRO, Doing Business as ISLAND CARTING and NICHOLAS FERRANTE et al., Appellants.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SALVATORE AVELLINO, JR., SALEM SANITARY CARTING CORP., THOMAS RONGA, DETAIL CARTING COMPANY and JAMAICA ASH AND RUBBISH REMOVAL COMPANY, INC., Appellants.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES J. CORRIGAN, JR., ANTHONY VESPUCCI and SALVATORE AVELLINO, JR., Appellants.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ARTHUR ROMERSA and VITO BIONDO, Appellants.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES J. CORRIGAN, JR., Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ARTHUR ROMERSA, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER F. FINNERTY, Appellant.

Second Department, December 30, 1988

*Meyer, Suozzi, English & Klein (Bernard S. Meyer* and *Andrew J. Turro* of counsel), for all appellants other than Jamaica Ash and Rubbish Removal.

*Stephen P. Scaring, P. C. (Laurie S. Hersey* of counsel), for Jamaica Ash and Rubbish Removal, appellant.

*Ronald Goldstock, Deputy Attorney-General, Organized Crime Task Force (Martin Marcus, Steven Chananie* and *Vija Kemanis* of counsel), for respondent.

## OPINION OF THE COURT

KOOPER, J.

The principal issue to be resolved on appeal is whether the Director of the New York State Organized Crime Task Force has been permissibly empowered, in light of controlling Federal law, to apply for eavesdropping warrants pursuant to CPL 700.05 (5). For the reasons that follow, we conclude that he is empowered to do so, and affirm the judgments of conviction appealed from.

### I

The convictions from which the defendants appeal represent the culmination of a lengthy investigation by the New York State Organized Crime Task Force (hereinafter the Task Force) into organized crime and corruption in the refuse collection industry in Nassau and Suffolk Counties. The principal investigative tools employed by the Task Force in securing evidence against the defendants, were eavesdropping warrants obtained upon applications executed by the Task Force Director, Ronald Goldstock, pursuant to authorization issued by Attorney-General Robert Abrams. After the completion of the investigation, the defendants were charged with a variety of

crimes in several indictments. The County Court denied suppression of the conversations intercepted pursuant to the court-authorized eavesdropping warrants.

On appeal, the defendants contend, *inter alia,* that CPL 700.05 (5),[1] which confers wiretap applicant status upon the Director of the Task Force, is fatally inconsistent with the definitional provisions of, and underlying policy objectives sought to be achieved by, title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 USC §§ 2510-2520). They argue that the Federal statutory scheme, pursuant to which the "principal prosecuting attorney" of a State or a political subdivision thereof may apply for a wiretap warrant *(see,* 18 USC § 2516 [2]), was intended to limit the class of eavesdropping applicants to officials who are "politically accountable", and that the Director of the Task Force is neither a "principal prosecuting attorney" nor a politically accountable official within the meaning of the Federal statute. We disagree.

## II

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which constitutes the first comprehensive Federal legislation regulating electronic surveillance, prohibits—with limited exceptions—wiretapping and electronic surveillance unless accomplished pursuant to a court order requested by an authorized Federal or State law enforcement officer in connection with specified offenses *(see, United States v Giordano,* 416 US 505, 507; *United States v Chavez,* 416 US 562; *see generally,* Note, *Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968,* 23 Rutgers L Rev 319). In enacting title III, Congress "relied upon the broadest reach of its commerce clause powers, in large part to impose upon the States the minimum constitutional criteria for electronic surveillance legislation mandated by *Berger v New York* (388 US 41) and *Katz v United States* (389 US 347)" *(see, People v Shapiro,* 50 NY2d 747, 762-763). Although title III "recognizes

---

1. CPL 700.05 (5) provides, in pertinent part, that the term "applicant" as employed in CPL article 700 "means a district attorney or the attorney general or if authorized by the attorney general, the deputy attorney general in charge of the organized crime task force". CPL 700.10 (1) states that "[u]nder circumstances prescribed in this article, a justice may issue an eavesdropping warrant upon an ex parte application of an applicant who is authorized by law to investigate, prosecute or participate in the prosecution of the particular designated offense which is the subject of the application".

that a State is free to either adopt procedures and standards more restrictive than those imposed by the Federal act or, if it desires, to prohibit wiretapping within its borders altogether * * * under pre-emption principles, any State law drawn more broadly than title 3's standards runs afoul of the supremacy clause (US Const, art VI, cl 2; see Tribe, American Constitutional Law, p 379)" *(see, People v Shapiro, supra,* at 763; *see also, People v Principe,* 65 NY2d 33, 36). The avowed legislative objective sought to be achieved through enactment of title III was the combatting of organized crime, in respect to which the framers expressly characterized authorized electronic surveillance as an "indispensable" investigative tool (S Rep No. 1097, 90th Cong, 2d Sess, 1968, reprinted in 1968 US Code, Cong & Admin News 2112, 2161; hereinafter Senate Report). Although deeply concerned with the pervasive growth of organized crime (Senate Report, at 2154), the framers were equally intent upon "protect[ing] the privacy of wire and oral communications by confining State authorization for eavesdropping by wiretap to what in Congress' view are appropriate and compelling circumstances" *(People v Shapiro, supra,* at 763). Reflecting this concern is the Senate Report's recounting of the "dual purpose" of title III as: "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized" (Senate Report, at 2153). Commenting upon the paucity of State legislation in the area of wiretapping and the resultant lack of uniformity, the framers of title III recognized the need—through uniform Federal legislation—to provide guidance and supervision to State and Federal law enforcement officers (Senate Report, at 2156).

As prescribed by the enabling provisions of the Federal statutory scheme, a State is empowered to legislatively designate specified officials as wiretap applicants, provided that the designation comports with the restrictive parameters imposed by 18 USC § 2516 (2).[2] Cognizant, however, of the disparity in

2. 18 USC § 2516 (2) provides: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or

nomenclature employed by the various States in describing their law enforcement personnel, the framers of title III eschewed as impractical, any attempt to catalogue by name the State officials in whom the authority to make applications could be permissibly vested *(see, United States v Lanza,* 341 F Supp 405, 410; *State v Daniels,* 389 So 2d 631, 635 [Fla]). Instead, the framers implemented their intent to circumscribe the class of wiretap applicants by providing, in 18 USC § 2516 (2), that "[t]he principal prosecuting attorney of any State, or * * * political subdivision thereof * * * may apply [for an eavesdropping warrant]". The legislative history pertinent to 18 USC § 2516 (2) is instructive, inasmuch as it counsels against a procrustean application of the term "principal prosecuting attorney", noting that, "[t]he important question * * * is not name but function" and advising that State law was to govern with respect to identity of an official as a "principal prosecuting attorney" (Senate Report, at 2187). The Senate Report further discloses that the legislative purpose in limiting wiretap applicants to "principal prosecuting attorneys" was to "provide for the centralization of policy relating to statewide law enforcement" (Senate Report, at 2187) with respect to wiretapping by placing the "power to seek electronic surveillance orders * * * with some central, responsible authority in order to guard against violations of personal rights protected by the fourth and fourteenth amendments" *(State v Daniels, supra,* at 635; Senate Report, at 2187; *see, United States v Giordano,* 416 US 505, *supra).*

### III

When viewed within the context of the foregoing congressional objectives, and guided by the precept that function, not name is the governing criterion (Senate Report, at 2187; *Commonwealth v Vitello,* 367 Mass 224, 327 NE2d 819; *United States v Domme,* 753 F2d 950, 956, *cf., State v Chiarizio,* 8 Conn App 673, 514 A2d 370, 379), it is our conclusion that the

---

electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses."

Director of the Organized Crime Task Force has been permissibly designated as an authorized wiretap applicant within the purview of controlling Federal law. We begin by observing, as the Court of Appeals has instructed, that in determining whether a challenged State statute is preempted by Federal law, the inquiry must focus on "whether the State statute at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " *(see, People v Shapiro,* 50 NY2d 747, 763, *supra,* quoting *Hines v Davidowitz,* 312 US 52, 66-67; *see also, Michigan Canners & Freezers v Agricultural Bd.,* 467 US 461, 469; *Capital Cities Cable v Crisp,* 467 US 691, 699; *Silkwood v Kerr-McGee Corp.,* 464 US 238, 248). Contrary to the defendants' contentions, the designation of the Task Force Director as an authorized wiretap applicant poses no obstacle to the achievement of the framers' objectives in enacting 18 USC § 2516 (2), i.e., "to provide for the centralization of policy relating to statewide law enforcement" with regard to electronic surveillance in a State official "responsible * * * to the political process" *(see,* Senate Report, at 2187, 2185; *United States v Giordano,* 416 US 505, 520, *supra).*

In respect to the foregoing congressional objectives, it is significant that the creation of the Organized Crime Task Force has its genesis in legislative findings which parallel, in many respects, those identified as significant by the framers of title III; principal among them the desirability of ensuring uniformity and centralization of procedure as a means of enhancing the effectiveness of law enforcement personnel in combating organized crime *(see,* legislative findings, L 1970, ch 1003, § 1 [3]; Senate Report, at 2187). In order to effectuate this intent the Legislature "established a task force, within the Office of the Attorney-General, whose sole purpose would be to investigate and prosecute those involved in organized criminal activity" *(Matter of Sussman v New York State Organized Crime Task Force,* 39 NY2d 227, 235 [Jasen, J., dissenting]; *see also, Della Pietra v State of New York,* 71 NY2d 792, 797; *People v Rallo,* 39 NY2d 217), to be headed by a single prosecuting attorney—selected jointly by the Governor and the Attorney-General—upon whom State-wide investigatory powers were conferred directly by statute and in whom was vested the authority to act with relative independence in conducting investigations within his jurisdiction *(see,* Executive Law § 70-a [2], [3], [4], [7]). The foregoing statutory scheme fully comports with the concepts of political accountability

and centralization of procedure envisaged by the framers of title III.

The defendants nevertheless contend that the Task Force Director cannot be characterized as a "principal prosecuting attorney" and further suggest that he is not sufficiently responsive to the political process within the intendment of Congress. The defendants' insistence upon a literal construction of the phrase "principal prosecuting attorney" unduly circumscribes its application (see, Senate Report, at 2187; cf., United States v Lanza, 341 F Supp 405, 410, supra) and fails to meaningfully incorporate as guiding criteria the policy objectives sought to be achieved by Congress in utilizing the statutory term. In fashioning the enabling provisions through which its intent was to be imposed on the States (see, People v Shapiro, supra; Senate Report, at 2187) and emphasizing the importance of function over name, Congress sought to ensure that the individuals designated as eavesdropping applicants would be identifiable persons—as defined by State law—to whom "the lines of responsibility lead" (Senate Report, at 2185). The Task Force Director, a politically appointed prosecutor empowered to investigate and prosecute organized crime on a State-wide basis, is such a person. While Congress may not—and, indeed, recognized that it could not—have anticipated with specificity the manner in which the various States would implement their eavesdropping statutes (Senate Report, at 2187; United States v Lanza, supra), New York's statutory scheme is within the intent and "spirit of the federal Act" (Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 700.05, at 462).

Nor have the defendants' conclusory allegations established that the statutory process by which the Task Force Director is appointed, undermines Congress's intent that an applicant be "responsive" to the political process. Although the defendants suggest that an eavesdropping applicant must be elected in order to satisfy the criterion that he be "responsive" to the political process, we discern no Federal mandate, either express or implied, which imposes such a requirement.[3] To so

3. Significantly, as originally enacted, title III listed as Federal applicants, the Attorney-General and, when so designated by the Attorney-General, the nine Assistant Attorney-Generals, none of whom are elected officials (see, 18 USC § 2516 [former (1)]). As one commentator has observed, several States—in addition to New York—have designated as applicants officials other than the Attorney-General and District Attorneys (see, Note, Significant Development—Electronic Surveillance—State Authorization of

hold, would be to unreasonably foreclose the designation of qualified applicants in States whose systems may contemplate the appointment of prosecuting attorneys. Further, none of the authorities relied on by the defendants provides otherwise *(see, State v Farha,* 218 Kan 394, 544 P2d 341, *cert denied* 426 US 949; *Poore v State,* 39 Md App 44, 384 A2d 103; *State v Cocuzza,* 123 NJ Super 14, 301 A2d 204; *State v Frink,* 296 Minn 57, 206 NW2d 664; *see also, State v Daniels,* 389 So 2d 631 [Fla], *supra).* Rather, those cases involve either State statutes pursuant to which a broad class of assistant State attorneys were permitted to submit applications for eavesdropping warrants *(see, e.g., State v Farha, supra; State v Daniels,* 389 So 2d 631 [Fla], *supra),* or circumstances in which the prosecuting authorities failed to comply with a State's own enabling provision with regard to the identity of those empowered to apply for eavesdropping warrants *(see, e.g., State v Frink, supra; State v Cocuzza, supra).* No such infirmities are presented in the case at bar. Moreover, not only is the Task Force Director an identifiable, statutorily empowered prosecutor selected by the Governor and Attorney-General, his status as an eavesdropping applicant—paralleling the provisions of title III applicable to Federal courts *(see,* 18 USC § 2516 [1])—is dependent upon the prior authorization of the Attorney-General, thereby further enhancing the express intent of title III that "access to wiretap orders be strictly limited to certain designated public officials" *(see, People v Di Pasquale,* 47 NY2d 764, 767 [Wachtler, J., dissenting]; *see also,* Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 700.05, at 462).

In short, the Legislature's inclusion of the Task Force Director—a joint appointee of two highly visible elected officials—within the narrow class of those empowered to apply for eavesdropping warrants, transgresses neither of the two significant Federal concerns identified by the framers of title III as defining the parameters within which State enactments must be confined.

We have reviewed the defendants' remaining contentions and find them to be either lacking in merit or unpreserved for appellate review.

*Wiretaps Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968,* 56 B U L Rev 600, 604, n 32).

BRACKEN, J. P., WEINSTEIN and KUNZEMAN, JJ., concur.

Ordered that the 29 judgments of the County Court, Suffolk County, are affirmed and the cases of Peter Francis Finnerty, James Corrigan, Arthur Romersa and Vito Biondo are remitted to the County Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (5).